UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
DARREN J. STRIDIRON and MATTHEW A.
STRIDIRON,

                                        Plaintiffs,

         - against -

NEWBURGH ENLARGED CITY SCHOOL
DISTRICT, CAROLE MINEO, PHIL HOWARD,
LISA MARIE SPINDLER, and ROBERTO
PADILLA,

                                        Defendants.
------------------------------------------------------------x

**OPINION & ORDER**

No. 20-CV-6823 (CS)

<u>Appearances</u>:
Darren J. Stridiron
Matthew A. Stridiron
Wallkill, New York
*Pro Se Plaintiffs*

Caroline B. Lineen
Silverman & Associates
White Plains, New York
*Counsel for Defendants*

<u>Seibel, J.</u>

         Before the Court is the motion for summary judgment of Defendants Newburgh Enlarged

City School District (the "District"), Carole Mineo, Phil Howard, Lisa Marie Spindler and

Roberto Padilla.  (ECF No. 84.)  For the following reasons, the motion is GRANTED.

I.       **BACKGROUND**

         A.       **Facts**

         The following facts are based on the parties' Local Civil Rule ("LR") 56.1 Statements,

(ECF No. 85 ("Ds' 56.1 Stmt."); ECF No. 97 ("Ps' 56.1 Resp."); ECF No. 98 ("Ps' 56.1 Stmt.");

ECF No. 101 ("Ds' 56.1 Resp.")), and the evidentiary materials submitted by the parties, and are

undisputed unless otherwise noted.[1]

_____

[1] The parties' respective LR 56.1 submissions are deficient in different ways. First, although Plaintiffs submitted a 56.1 Statement responding to Defendants' moving 56.1 Statement, (ECF No. 97), as required by LR 56.1(b), they also submitted what they called their "Statement of Undisputed Material of Fact," (ECF No. 98), which is not authorized by the Rule. LR 56.1 allows the non-moving party to submit "if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." It does not allow the non-moving party to submit a list of facts the non-moving party believes are undisputed. *See Ostreicher v. Chase Bank USA, N.A.*, No. 19-CV-8175, 2020 WL 6809059, at *1 n.1 (S.D.N.Y. Nov. 19, 2020) ("There is no provision for a responsive 56.1 Statement to include additional facts that are not in dispute but that a party opposing summary judgment simply thinks are important; any additional facts should be confined to material facts in dispute.") (Unless otherwise indicated, case quotations omit all internal citations, quotation marks, footnotes, and alterations.) (The Court will send Plaintiffs copies of any unpublished decisions cited in this Opinion and Order.)

In light of Plaintiffs' *pro se* status, however, I have considered their unauthorized submission. But it contains many facts that are immaterial and do not help the Court in narrowing the issues for trial. (*See, e.g.*, Ps' 56.1 Stmt. ¶¶ 94-98, 109-124, 147-160, 168-181, 194-198); *see Ramgoolie v. Ramgoolie*, No. 16-CV-3345, 2018 WL 5619959, at *2 (S.D.N.Y. Aug. 3, 2018) (noting that plaintiff's Rule 56.1 statement was procedurally improper because it "is essentially a recitation of her case in chief" with "many facts [that] . . . are immaterial and do not help the Court in narrowing the issues for trial" and "statements [that] are opinions or legal conclusions that have no place in a Rule 56.1 statement"), *report and recommendation adopted*, 2018 WL 4266015 (S.D.N.Y. Sept. 6, 2018). Similarly, Plaintiffs' response to Defendants' 56.1 Statement contains several purported denials that do not actually deny or refute the specific facts asserted by Defendants, but instead quibble with Defendants' phraseology or speak past Defendants' asserted facts without specifically controverting them. (*See, e.g.*, Ps' 56.1 Resp. ¶¶ 60, 66, 69, 75, 108, 115, 123, 137-141.) In such circumstances, the Court will deem admitted Defendants' facts where the record evidence supports Defendants' contentions. *See Warren v. Ewanciw*, No. 15-CV-8423, 2019 WL 589488, at *2 n.4 (S.D.N.Y. Feb. 13, 2019).

Second, Defendants' response to Plaintiffs' Rule 56.1 Statement raises many of its objections to Plaintiffs' Rule 56.1 Statement in a section titled "Preliminary Statement," in which Defendants apply blanket objections to dozens of Plaintiffs' factual assertions. (*See* Ds' 56.1 Resp. at 1-3.) In so doing, Defendants fail to comply with item 2.C.i of my individual practices, which requires the opposing party to reproduce each entry in the moving party's Rule 56.1 Statement before setting out its response thereto. Defendants' failure to reproduce all of Plaintiffs' statements in their entirety defeats the purpose of my individual practice, which is designed to prevent the Court from having to go back and forth between the Rule 56.1 Statement and the response.

Plaintiff Matthew Stridiron ("Matthew") attended Newburgh Free Academy ("NFA"), the District's high school, graduating in June 2019. (Ps' 56.1 Resp. ¶ 1.) He also graduated from the "P-Tech" program at SUNY Orange in May 2019, receiving an associate's degree in cybersecurity. (*Id.* ¶ 2.) Plaintiff Darren Stridiron ("Mr. Stridiron") is Matthew's father and has served as a member of the District's Board of Education (the "Board") since 2014. (*Id.* ¶ 4.) Defendant Mineo has been a Board member since July 2014 and has served as President since the 2015-16 school year, and Defendant Howard has been a Board member since July 2012. (*Id.* ¶¶ 9-10.) At the times relevant to this lawsuit, Defendant Spindler was employed by the District as the Assistant Superintendent for Curriculum & Instruction, Secondary, and Defendant Padilla was employed by the District as the Superintendent. (*Id.* ¶¶ 11-12.)

### 1. The District's Grading Policies and the Initial Valedictorian Dispute

During the 2018-19 school year, Onyx Peterson was the District's Director of Pupil Personnel Services. (*Id.* ¶ 13.) In that capacity, she oversaw the District's Guidance and Counseling Department, but was not responsible for overseeing its day-to-day operations. (*Id.* ¶ 15.) The Guidance and Counseling Department provides the District's students with counseling services and maintains their academic records, which are stored in an electronic system called Infinite Campus, (*id.* ¶¶ 14, 16), which is overseen by the District's Assistant Superintendents of Curriculum and Instruction and by its Chief Information Officer, Salvatore Vasile, (*id.* ¶ 17).

District policy provides that class rank is calculated after the third quarter and is based on completed and in-progress posted grades. (*Id.* ¶ 18.) To perform that calculation, the District takes the sum of the weighted course grade multiplied by the grade point average ("GPA")

weight and then divides by the total GPA weight or credit.  (*Id.* ¶ 19.)[2]  Although the policy does

not differentiate between in-District and out-of-District classes, grades from out-of-District

classes generally are not included in the class rank calculation because they are not provided to

the District and posted to the student's transcript until they are finalized at the end of the year.

(*Id.* ¶¶ 21-23.)

Christine Harrold is a guidance counselor assigned to the North Campus of the NFA, and

served as Matthew's guidance counselor throughout his four years as an NFA North Campus

student.  (*Id.* ¶¶ 25, 28.)  During his senior year (2018-19), Matthew took classes at NFA's North

Campus and its Main Campus, and also attended the P-Tech program at SUNY Orange.  (*Id.* ¶

29.)  He took only AP Macroeconomics and English 12 at the Main Campus.  (*Id.* ¶ 30.)  The

Infinite Campus course calendars for NFA's North Campus and Main Campus are separate, such

that student schedules and grades from the respective campuses are not synced.  (*Id.* ¶ 31.)

In October 2018, the District calculated the class rank of its high school seniors for

informational purposes; Matthew and another student, M.P., had identical GPAs of 101.698.  (*Id.*

¶ 32.)  Matthew's in-progress grades for his two Main Campus courses were not pulled for that

calculation.  (*Id.* ¶ 33.)  Several months later, Mr. Stridiron asked Defendant Spindler when class

rank calculations would be completed; Spindler advised that it would be after the third quarter,

which she also confirmed with the Principal of NFA's North Campus, Matteo Doddo, a non-

---

[2] The District differentiates between credits actually earned at the end of a course versus
GPA weight for purposes of class rank calculations.  (Ps' 56.1 Resp. ¶ 20.)  As the Court
understands it, for purposes of calculating GPA, full-year courses generally get a GPA credit of
1, and half-year courses get a GPA credit of 0.5.  (*See* ECF No. 88-10 at 48:19-68:7, 127:14-
128:2.)  Honors or advanced placement ("AP") classes get a weight of 1.05, whereas regular
classes get a weight of 1.  (*See* ECF No. 88-8 at 27:25-28:8; ECF No. 88-14 at 18:15-19:7,
39:16-40:14.)  A grade of 100 in a full-year regular class would count as 100 points in
calculating GPA, and a grade of 100 in a full-year honors or AP class would count as 105.  (*See*
ECF No. 88-14 at 39:16-40:18.)

party.  (*Id.* ¶ 34; *see* ECF No. 88-13 ¶ 1.)  On January 24, 2019, Matthew asked Harrold if third

quarter grades contributed to class rank; Harrold indicated that they did not and advised Matthew

that class rank would be calculated based on final course grades.  (Ps' 56.1. Resp. ¶ 35.)  While

Harrold believed at the time that her response to Matthew was accurate, she later learned that she

incorrectly relayed how class rank was calculated.  (*Id.* ¶ 36.)

At some point in February 2019, M.P.'s parents asked Peterson about the District's GPA

calculation process and expressed concerns about the confidentiality of M.P.'s grades, Matthew's

alleged preoccupation with M.P.'s grades, and whether the class rank process would be fair in

light of Mr. Stridiron's role as a Board Member.  (*Id.* ¶ 38.)[3]  In response, Peterson explained

that class rank was determined via a calculation and that the Board did not interfere with student

GPAs.  (*Id.* ¶ 39.)

On May 13, 2019, Vasile sent an email to Spindler, Peterson, Doddo and the Principal of

NFA's Main Campus, Raul Rodriguez, attaching the results of GPA calculations for seniors

generated by Infinite Campus, and stating that the calculations should be reviewed and

recalculated by hand to confirm their accuracy.  (*Id.* ¶¶ 40-41; ECF No. 88-19 ¶ 2.)  Those

calculations indicated that Matthew had the highest GPA in his class and that M.P. had the

second highest.  (Ps' 56.1 Resp. ¶¶ 43-44.)  On May 14, 2019, Doddo and Assistant Principal

Kevin Rothman met with Matthew and gave him a letter advising him that he was the

valedictorian of NFA's 2019 graduating class.  (*Id.* ¶ 48.)  Prior to meeting with Matthew,

---

[3] Plaintiffs attempt to dispute this statement by claiming that M.P.'s parents "also accused Matthew Stridiron of bullying and harassment of their son."  (Ps' 56.1 Resp. ¶ 38.)  In so doing, Plaintiffs are "improperly interject[ing] arguments and/or immaterial facts in response to facts asserted by Defendants," *Baity v. Kralik*, 51 F. Supp. 3d 414, 418 (S.D.N.Y. 2014), rather than directly responding to Defendants' assertion that M.P.'s parents raised the specified issues with Peterson.  Accordingly, Plaintiffs "fail[] to comply with the spirit, if not the letter of [Rule 56.1]" by "speaking past . . . asserted facts without specifically controverting those same facts."  *Id.*

Doddo had been hospitalized for two weeks, (*see id.* ¶ 47; ECF No. 88-12 at 11:14-12:13), and as a result he did not verify the GPA calculations generated by Infinite Campus prior to providing Matthew the letter naming him valedictorian, (*see* Ps' 56.1 Resp. ¶ 49; ECF No. 88-12 at 32:22-33:23, 90:9-91:6). He also did not tell Padilla, Spindler, or Peterson that he would be giving Matthew a letter naming him sole valedictorian. (Ps' 56.1 Resp. ¶ 51.)

M.P.'s parents disputed the determination that Matthew was sole valedictorian and raised concerns that Mr. Stridiron's position on the Board may have provided Matthew with an unfair advantage. (*Id.* ¶ 52.) In response, Peterson and Vasile took steps to verify the GPAs and class ranks generated on May 13. (*See id.* ¶¶ 40, 54.) Peterson determined that Matthew's Main Campus grades for AP Macroeconomics and English 12 were not included by Infinite Campus, which only pulled his North Campus grades when performing the May 13 calculation. (*Id.* ¶¶ 55-56.) Peterson notified Spindler of that discrepancy and they met to check grades and perform additional calculations to verify the GPAs at issue. (*Id.* ¶¶ 57-58.) Spindler also informed Padilla about the errors Peterson discovered and subsequently met with Peterson, Doddo, Rodriguez, and Rothman on May 20, 2019, to perform additional calculations to verify the GPAs and class ranks. (*Id.* ¶¶ 59-60.) Padilla did not participate in or attend the May 20 meeting organized by Spindler. (*Id.* ¶ 62.)

The calculations performed at the May 20 meeting included Matthew's two Main Campus grades that were initially omitted and mirrored the GPA generated by Infinite Campus once it also included the two Main Campus grades. (*Id.* ¶¶ 63-64.) Those calculations indicated

that Matthew had a GPA of 101.684 and M.P. had a GPA of 101.726, information which

Spindler relayed to Padilla and Mr. Stridiron.  (*Id.* ¶¶ 64-65, 67-68.)[4]

Padilla then designated Matthew and M.P. as co-valedictorians.  (*Id.* ¶ 75.)  That decision

was not made by the Board or any Board members.  (*Id.* ¶ 77.)  On May 22, 2019, Doddo and

Rothman met with Matthew, informed him that he would be named co-valedictorian alongside

M.P., and gave him a letter to that effect.  (*Id.* ¶ 79.)  That letter included an apology for any

confusion that may have arisen from the May 14 letter naming Matthew sole valedictorian.  (*See*

---

[4] Defendants assert, and support with evidence, that neither Padilla nor any member of the Board directed or pressured Spindler, Peterson, Doddo, Rothman, or Rodriguez to make changes to Matthew's grades or credits, to calculate the class rank such that Matthew did not have the highest GPA, or to take any action to ensure that Matthew was not valedictorian.  (Ds' 56.1 Stmt. ¶ 66.)  Plaintiffs attempt to dispute this assertion by alleging that Defendant Howard contacted a reporter, Lana Bellamy, "in an attempt to put [out] a false, racially charged story regarding how Darren Stridiron was using his influence to make his son Matthew, the Valedictorian and that in that process, he was stealing that honor from a poor Hispanic child," relying on statements made by Bellamy in texts (and perhaps a conversation) with Mr. Stridiron.  (Ps' 56.1 Resp. ¶ 66.)  Howard denies having done so and says his nephew contacted Bellamy using his phone.  (Ds' 56.1 Stmt. ¶ 88.)

As a threshold matter, Plaintiffs' supporting evidence consists of inadmissible hearsay, *i.e.*, unsworn out-of-court statements of Bellamy offered for their truth.  *See Athineos v. Andromeda Invs. Co.*, No. 13-CV-5076, 2015 WL 6467842, at *7 (S.D.N.Y. Oct. 23, 2015) (rejecting evidence offered in 56.1 Statement as "hearsay – out-of-court statements made by third parties in order to prove the truth of the matter asserted"); *Levarge v. Preston Bd. of Educ.*, 552 F. Supp. 2d 248, 251 n.3 (D. Conn. 2008) (unsworn correspondence not admissible evidence for purposes of summary judgment); *Dukes v. City of N.Y.*, 879 F. Supp. 335, 343 (S.D.N.Y. 1995) ("[U]nsworn statements are not admissible to controvert a summary judgment motion.").  Even setting aside Plaintiffs' reliance on hearsay, and the fact that even Bellamy does not appear to have personal knowledge of Howard's alleged conduct, *see Levarge*, 552 F. Supp. 2d at 251 n.3, Plaintiffs do not claim that Howard made any such statement to, or otherwise pressured, any of the individuals involved in the recalculation of Matthew's grades, or that any such article ever appeared.  They are therefore again "improperly interject[ing] . . . immaterial facts in response to facts asserted by Defendants [and] speaking past Defendants' asserted facts without specifically controverting those same facts."  *Baity*, 51 F. Supp. 3d at 418.

Accordingly, while the parties go to great lengths disputing whether Howard and Bellamy interacted, and the nature of that interaction, (*see, e.g.*, Ps' 56.1 Resp. ¶¶ 66, 88; Ps' 56.1 Stmt. ¶¶ 109-122), those facts are not material.  *See Pisano v. Mancone*, No. 08-CV-1045, 2011 WL 1097554, at *2 n.2 (S.D.N.Y. Mar. 21, 2011).

*id.* ¶¶ 48, 80.)  Matthew subsequently gave a valedictorian speech during his NFA graduation.  (*Id.* ¶ 81.)

### 2.   Matthew's SUNY Orange Graduation

On May 23, 2019, Matthew graduated from SUNY Orange.  (*Id.* ¶ 83.)  At that graduation, he was interviewed by a local reporter.  (*Id.* ¶ 84.)  While it is not readily apparent from the parties' LR 56.1 Statements, Matthew testified that Cassie Sklarz, a non-party District employee, stood "very closely to watch the interview" and got "into a big argument" with the reporter when asked to stand further back.  (*See* ECF No. 88-6 ("Matthew's 50-h Depo.") at 92:14-93:15.)[5]  Matthew also testified that Ari Fishkind, a non-party employed by IBM, (*see* Ps' 56.1 Resp. ¶ 85)[6], touched his arm and attempted to pull him away from the interview, (Matthew's 50-h Depo. at 93:16-94:5).

### 3.   Grade Revisions and Matthew's Transcripts

By the time the co-valedictorian decision was issued, Matthew had been admitted by Columbia University ("Columbia") and had received decisions from all of the colleges to which he had applied.  (Ps' 56.1 Resp. ¶ 94.)  On May 28, 2019, Harrold advised Spindler and Peterson

---

[5] While this deposition was taken pursuant to General Municipal Law § 50-h, such testimony "is properly considered on a motion for summary judgment and admissible at trial under Federal Rule of Evidence 801(d)(1)."  *Perry v. County of Westchester*, No. 09-CV-9391, 2011 WL 5978544, at *4 n.4 (S.D.N.Y. Nov. 29, 2011).

[6] Plaintiffs attempt to dispute that Fishkind works for IBM and not the District by describing him as "an employee of IBM that had a contract with the district to provide educational and internship services and that work was paid for through a New York State Grant in partnership with SUNY Orange, IBM and the Newburgh School District."  (Ps' 56.1 Resp. ¶ 85.)  Not only does this response concede that Fishkind worked for IBM and that IBM's relationship with the District was contractual, but the evidence on which Plaintiffs rely – what appears to be a portion of Fishkind's LinkedIn page, (ECF No. 96-71), and an IBM publication regarding P-Tech, (ECF No. 96-72) – does not begin to show any employment or agency relationship between the District and Fishkind.

that she had told her secretaries that transcripts should not be released to Matthew and M.P. until the accuracy of those transcripts and the accompanying class ranks were confirmed.  (*Id.* ¶ 96.) Although the District's academic year ends on June 30, transcripts are typically updated in the first week of July and finalized for distribution by July 15.  (*Id.* ¶ 97.)  Matthew's transcript was submitted to Columbia by July 14, 2019.  (*Id.* ¶¶ 98-99.)  That same day, Spindler forwarded Matthew's complete fourth quarter report card and transcript to Mr. Stridiron.  (*Id.* ¶ 100.)

In July 2019, Matthew informed the District that his fourth quarter report card was inaccurate and the District responded that the inaccuracies he identified occurred because of the manner in which his Main Campus grades were pulled to ensure their inclusion in the class rank calculations.  (*Id.* ¶ 101.)  Matthew also stated that his grade in AP Computer Science, which he took and completed during the prior school year, needed to be increased from 104 to 105.  (*Id.* ¶ 102.)  But that grade had not been appealed after its receipt during the 2017-18 school year, or the 2018 summer, as required by the District's policy concerning grade appeals.  (*Id.* ¶¶ 103-104.)  While Plaintiffs were initially advised that Matthew's grade in AP Computer Science was correct based on how AP and Honors classes with final examinations were graded, (*see id.* ¶ 105), Spindler eventually increased Matthew's grade to 105 after reviewing historical grading data, (*id.* ¶ 106).  The revision of Matthew's AP Computer Science left him and M.P. with identical GPAs of 101.726.  (*Id.* ¶ 109.)  Matthew's transcript was revised to reflect the change to his AP Computer Science grade and an updated transcript was provided to Columbia.  (*Id.* ¶ 110.)

Starting on May 17, 2019, Matthew began disputing the grade he received in Walking for Wellness, a class he took at SUNY Orange.  (*Id.* ¶ 111.)  He sent a dozen emails to the professor over the next month, but she maintained that the A- that Matthew received would stand.  (*See*

ECF No. 88-27.)  After he requested and was granted a meeting with the chair of the Department of Movement Science, the grade was changed to an A on June 19, 2019.  (*Id.* at 12[7]; *see* Ps' 56.1 Resp. ¶¶ 114-115.)  The District received an updated transcript from SUNY Orange on July 31, 2019 – well after graduation – and prepared an updated transcript that it provided to Matthew and Columbia, showing that Matthew received an A in Walking for Wellness.  (*Id.* ¶¶ 116-120.) But the change did not increase Matthew's GPA for class rank purposes, because that grade had been calculated after the third quarter.  (*Id.* ¶¶ 121-122.)  Matthew's final transcript includes the updated grades for both AP Computer Science and Walking for Wellness, as well as his date of graduation.  (*Id.* ¶¶ 123, 126.)

Matthew's acceptance to Columbia was never revoked and he was not prevented from taking any classes at Columbia because of the grades on his transcript provided by the District. (*Id.* ¶¶ 125, 127.)  Although the District submitted multiple transcripts to Columbia on Matthew's behalf, it was never told that Matthew's enrollment or scholarship were in jeopardy. (*Id.* ¶ 128.)[8]

---

[7] All citations to ECF Nos. 88-27 and 96-104 refer to page numbers set by the Court's Electronic Case Filing ("ECF") system.

[8] Plaintiffs attempt to dispute Defendants' statement, arguing that Matthew's enrollment at Columbia for the fall 2019 semester was in jeopardy, and therefore so were his scholarship funds designated for that semester, (*see* Ps' 56.1 Resp. ¶ 128), by pointing to an email Matthew received from Columbia's Dean of Undergraduate Admissions and Financial Aid on July 12, 2019, which states that Matthew "will not be able to register for classes if we are missing your final transcript" and instructs Matthew to request that his transcript (with his graduation date) be submitted to Columbia "as soon as [it is] available and no later than Thursday, August 1," (*see* ECF No. 96-59).  But receipt of that form email reminder hardly suggests that Matthew's enrollment was ever in jeopardy (let alone his scholarship, which the email does not even mention).  Matthew testified that his acceptance to Columbia was never revoked and that he was able to register for classes after the District provided Columbia with his academic records, which he believes was on August 2nd.  (*See* Matthew's 50-h Depo. at 84:15-85:17, 88:12-22.) Accordingly, Plaintiffs' claims are little more than "unsupported assertions" that must be

### 4.    Mr. Stridiron's Board Service

The Board has several committees on which Board members serve alongside members of the District's administration.  (*Id.* ¶ 129.)  Board committee assignments are set annually by the Board's President, (*id.* ¶ 130), and there is no limit on the number of committees on which a Board member may serve, (*id.* ¶ 131).  Board President Mineo considers several criteria when assigning Board members to committees, including the strengths and weaknesses of Board members and what they offer to specific committees, as well as the working dynamics and relationships between Board members and District administrators.  (*Id.* ¶ 132.)  Committees are not authorized or empowered to act on behalf of the Board or the District, cannot approve policy, and do not make hiring or termination decisions.  (*Id.* ¶ 133.)  Instead, the Board can only take action as a whole.  (*Id.* ¶ 134.)  Board committee meetings are recorded and the discussions that take place at those meetings are reported to the Board as a whole.  (*Id.* ¶ 135.)  Additionally, any Board member can obtain information about any committee meeting, irrespective of whether the Board member serves on a given committee.  (*Id.*)

During his tenure as a Board member, Mr. Stridiron has served on several Board committees, including the Policy Committee.  (*Id.* ¶¶ 136, 138.)  Mr. Stridiron was not assigned to the Policy Committee for the 2019-20 school year and was assigned only to the Library Committee.  (*Id.* ¶¶ 141-142; *see* ECF No. 88-16 ¶¶ 20, 26-27.)  Mineo assigned Mr. Stridiron to the Library Committee again for the 2019-20 school year and Mr. Stridiron did not request to be placed on any additional committees at that time.  (Ps' 56.1 Resp. ¶¶ 142-143.)  Since 2020-21,

---

disregarded.  *Emanuel v. Griffin*, No. 13-CV-1806, 2015 WL 1379007, at *2 (S.D.N.Y. Mar. 25, 2015).

Mineo has assigned Mr. Stridiron to at least two Board committees each year, but he has not been reassigned to the Policy Committee.  (*Id.* ¶¶ 141, 145.)

The parties dispute the rationale for Mr. Stridiron's removal from the Policy Committee. Defendants maintain the removal was done in response to Mr. Stridiron's "argumentative, accusatory, and condescending" behavior, (*id.* ¶ 138), which created "tension and discord" and impacted the Policy Committee's productivity, (*id.* ¶ 139).  Plaintiffs respond that Mineo and the Board removed Mr. Stridiron from the Policy Committee because he "brought to light topics and situations that the leadership of the school district and policy committee did not want to hear" and that Mineo and District personnel "viewed these topics as negative and encouraged other board members to treat [him] in a negative manner."  (*Id.* ¶¶ 137-141.)  Defendants allege that Mr. Stridiron continues to attend Board and Committee meetings, (*see* Ds' 56.1 Stmt. ¶ 146), and to participate actively and vocally, "express[ing] his opinions, thoughts, and arguments on District issues," (*id.* ¶ 147).  Mr. Stridiron contends that he does not attend and participate as much as he did before May 2019.  (Ps' 56.1 Resp. ¶¶ 146-147.)

Mr. Stridiron has been removed from the Board's executive sessions concerning Matthew and M.P.'s valedictorian status and any related claims.  (*Id.* ¶ 152.)  But he has never been denied the opportunity to vote on any Board action; he makes more comments and asks more questions than other members of the Board when the Board is in public session; and he continues to vote as he sees fit during Board votes.  (*Id.* ¶¶ 148-149, 151.)  Mr. Stridiron also still speaks to the press about District issues, his position on those issues, and his work as a Board member.  (*Id.* ¶ 150.)

### B.   **Procedural History**

Plaintiffs initially filed this action in the Supreme Court of the State of New York,

Orange County, and Defendants removed it to this Court on August 25, 2020.  (*See* ECF No. 5.)

On January 20, 2021, Defendants moved to dismiss Plaintiffs' claims in part.  (*See* ECF No. 18.)

I issued a bench ruling on August 11, 2021, granting the motion as to Plaintiffs' claims for

negligence, breach of fiduciary duty, breach of a nondelegable duty, fraudulent concealment,

intentional infliction of emotional distress, negligent infliction of emotional distress, fraud, due

process, equal protection and slander, and denying it as to Matthew's assault claims.  (*See*

Minute Entry dated Aug. 11, 2021.)  Following discovery, the parties briefed the instant motion.

(*See* ECF Nos. 84-103.)

## II.   **LEGAL STANDARD**

### A.   **Motion for Summary Judgment**

Summary judgment is appropriate when "the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

R. Civ. P. 56(a).  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is such that

a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect the outcome of the suit

under the governing law . . . .  Factual disputes that are irrelevant or unnecessary will not be

counted."  *Id.*  On a motion for summary judgment, "[t]he evidence of the non-movant is to be

believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 255.

The movant bears the initial burden of demonstrating "the absence of a genuine issue of

material fact," and, if satisfied, the burden then shifts to the non-movant to "present evidence

sufficient to satisfy every element of the claim."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d

Cir. 2008).  "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]."  *Anderson*, 477 U.S. at 252.  Moreover, the non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001).

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials . . . ."  Fed. R. Civ. P. 56(c)(1).  Where a declaration is used to support or oppose the motion, it "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the . . . declarant is competent to testify on the matters stated."  *Id.* 56(c)(4); *see Major League Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 310 (2d Cir. 2008).  In the event that "a party fails . . . to properly address another party's assertion of fact as required by Rule 56(c), the court may . . . consider the fact undisputed for purposes of the motion" or "grant summary judgment if the motion and supporting materials – including the facts considered undisputed – show that the movant is entitled to it."  Fed. R. Civ. P. 56(e).

**B.**    ***Pro se* Plaintiffs**

Submissions by *pro se* plaintiffs are to be examined with "special solicitude," *Tracy v. Freshwater*, 623 F.3d 90, 102 (2d Cir. 2010), interpreted "to raise the strongest arguments that they suggest," *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), and "held to less stringent

standards than formal pleadings drafted by lawyers," *Hughes v. Rowe*, 449 U.S. 5, 9 (1980) (*per curiam*), "particularly where motions for summary judgment are concerned," *Jackson v. Fed. Express*, 766 F.3d 189, 195 (2d Cir. 2014). *Pro se* status "does not, however, excuse a *pro se* litigant from making the showing required to defeat summary judgment; he or she must offer more than bald assertions, completely unsupported by evidence to overcome the motion." *Keesh v. Quick*, No. 19-CV-8942, 2022 WL 2160127, at *4 (S.D.N.Y. June 15, 2022).

## III.   DISCUSSION

Defendants seek summary judgment on Plaintiffs' surviving claims:  (1) First Amendment retaliation claims pursuant to 42 U.S.C. § 1983 brought by Mr. Stridiron and Matthew; and (2) a state law assault claim brought by Matthew.  (*See* ECF No. 87 ("Ds' Mem.") at 3-4.)

As a threshold matter, Plaintiffs' Opposition brief, (*see* ECF No. 96 ("Ps' Opp.")), does not include a single record citation.  While the Court could thus disregard all of the unsupported assertions in Plaintiffs' brief, *see Moschetti v. N.Y.C. Dep't of Educ.*, No. 15-CV-3161, 2018 WL 4759787, at *13 n.20 (S.D.N.Y. Sept. 28, 2018) ("[T]he Court very well could disregard every single one of [plaintiff's] unsupported assertions" where "she . . . does not include a single record citation *in her entire opposition*." (emphasis in original)), *aff'd*, 778 F. App'x 65 (2d Cir. 2019), it will, in light of Plaintiffs' *pro se* status, consider the record citations as set forth in their LR 56.1 submissions and construe Plaintiffs' brief to make the strongest arguments it suggests.

### A.   First Amendment Claims

"In order to succeed on a claim under 42 U.S.C. § 1983, a plaintiff must have been deprived of a federal right by a person or persons acting under color of state law." *McGuinn v. Smith*, No. 11-CV-4761, 2015 WL 12731755, at *5 (S.D.N.Y. Aug. 28, 2015).  The parties do

not dispute that Defendants acted under the color of state law, so the only issue is whether Defendants violated Mr. Stridiron and Matthew's First Amendment rights.

### 1.    First Amendment – Mr. Stridiron

"The Second Circuit has described the elements of a First Amendment retaliation claim in several ways, depending on the factual context." *Frisenda v. Incorporated Village of Malverne*, 775 F. Supp. 2d 486, 503 (E.D.N.Y. 2011).  In order for a public employee to state a *prima facie* claim of First Amendment retaliation under § 1983, he "must offer some tangible proof that (1) his speech was constitutionally protected; (2) he suffered an adverse employment action; and (3) a causal relationship existed between the two in that the speech was a . . . motivating factor for the adverse employment action." *Garvey v. Town of Clarkstown*, No. 13-CV-8305, 2018 WL 1026379, at *9 (S.D.N.Y. Feb. 22, 2018), *aff'd*, 773 F. App'x 634 (2d Cir. 2019).  "Retaliatory acts constitute adverse employment action if they would deter a similarly situated individual of ordinary firmness form exercising his or her constitutional rights." *McGuinn*, 2015 WL 12731755, at *5.  "An alleged act of retaliation must be more than *de minimis*, as it would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise." *Id.*

Plaintiffs maintain – without citation to record evidence – that the Defendants "retaliated directly against [Mr.] Stridiron for his protected speech in multiple ways," (Ps' Opp. at 3), including by "attempt[ing] to remove [him] from the Board" in connection with his testimony before a grand jury investigating whether student athletes were permitted to play despite poor attendance, (*id.* at 5; *see* ECF No. 96-53 ¶¶ 25-41).  Plaintiffs also allege that Mr. Stridiron was "subject to a series of online threats," (Ps' Opp. at 5), has "since been ostracized by the

leadership of the board and the district," (*id.*), and was "threatened . . . with a civil lawsuit for asking questions," (*id.*); that his "business has suffered substantially due to stress and time devoted to protecting his family against the lies and actions of the . . . District's leadership," (*id.* at 6); and that he has had to replace tires which were damaged due "to the retaliation of the district," (*id.*).

Many of these allegations are conclusory and fail to raise a genuine issue of material fact as to Mr. Stridiron's First Amendment retaliation claim. *See Rucano v. Annucci*, No. 18-CV-218, 2021 WL 3293504, at *19 (N.D.N.Y. May 19, 2021) (collecting cases), *report and recommendation adopted sub nom. Rucano v. Venettozzi*, 2021 WL 3292394 (N.D.N.Y. Aug. 2, 2021). Stripped of hearsay and allegations with no or only a greatly attenuated factual connection to any Defendant, what is left are actions that do not rise to the level of an adverse employment action. To be sure, if Mr. Stridiron had been removed from his Board position he would have suffered an adverse employment action because "the First Amendment bars state officials from stripping elected representatives of their office based on the political views of such representatives." *Paladino v. Seals-Nevergold*, No. 17-CV-538, 2020 WL 5544342, at *3 (W.D.N.Y. Sept. 15, 2020).

But Mr. Stridiron was never removed from his Board position. Instead, the record at most indicates that the Board sent Mr. Stridiron an email on December 22, 2021 stating that it would consider bringing proceedings to remove him, (*see* ECF No. 96-64 ("at a special meeting of the Board *consideration will be given to bringing proceedings* against you for removal from your position as a member of the Board" (emphasis added))), and that for the 2019-20 school year Mr. Stridiron was assigned to the Board's Library Committee rather than the Policy Committee, (Ps' 56.1 Resp. ¶¶ 141-142; *see* ECF No. 88-16 ¶¶ 20, 26-27). Courts in this circuit

17

have consistently held that such actions – which fall far short of removing an elected official from his or her office – are insufficient to state a First Amendment retaliation claim.  *See, e.g.*, *Paladino*, 2020 WL 5544342, at *3 (dismissing plaintiff school board member's First Amendment claim where defendant board members' allegedly retaliatory petition "set into motion" plaintiff's ouster, but "did not actually remove [plaintiff] from his position"); *McGuinn*, 2015 WL 12731755, at *5-6 (granting summary judgment on First Amendment claim where defendant school board members passed allegedly retaliatory resolution and launched "smear campaign" against plaintiff that "caused him to cease speaking" at meetings, but ultimately did not remove him from his elected position, even though they had authority to do so); *Mousaw v. Bd. of Educ. of Colton Pierrrepont Cent. Sch. Dist.*, No. 07-CV-1006, 2011 WL 1667909, at *6 (N.D.N.Y. May 3, 2011) (granting summary judgment on school board member's First Amendment claim where defendant board members with no expulsion power "engag[ed] in a deliberate campaign to humiliate and besmirch Plaintiff's character with the goal of removing her from the Board").

Plaintiffs do not dispute that Mr. Stridiron continues to serve on the Board, (*see* Ps' 56.1 Resp. ¶¶ 146-147), that he has been assigned to at least two Board committees each year since the 2020-21 school year, (*see id.* ¶ 145), that he "has never been denied the opportunity to vote on any Board action," (*id.* ¶ 148), that he "still speaks to the press about District issues, his positions on them, and his work as a Board member," (*id.* ¶ 150), and that he "continues to vote as he believes fit during Board votes," (*id.* ¶ 151).  Indeed, although the test is an objective one and Mr. Stridiron's own reaction is not the standard, *see McGuinn*, 2015 WL 12731755, at *6-7, he comments and asks questions during public Board sessions more than other members, (Ps' 56.1. Resp. ¶ 149).

In other words, the actions Plaintiffs ascribe to Defendants plainly "did not disturb [Mr. Stridiron's] right to express his political views in [Board meetings], to cast votes, and to serve his constituents in his capacity as a member of the [Board]." *King v. City of N.Y.*, 581 F. Supp. 3d 559, 571 (S.D.N.Y. 2022), *aff'd*, No. 22-231, 2023 WL 2398679 (2d Cir. Mar. 8, 2023). Therefore, no reasonable jury could find that the conduct alleged here "would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights," *McGuinn*, 2015 WL 12731755, at *5, particularly as that hypothetical individual would, like Mr. Stridiron, be an experienced Board member who has served multiple terms, (*see* Ps' 56.1 Resp. ¶ 5), and "actively participates in the deliberations of a contentious public body," *McGuinn*, 2015 WL 12731755, at *5; (*see* Ps' 56.1 Resp. ¶¶ 145-151).[9]

---

[9] Plaintiffs also allege that Mr. Stridiron suffered stress and depression as a result of Defendants' actions. (Ps' Opp. at 6; *see* Ps' 56.1 Stmt. ¶¶ 3-21.)

"It is an unsettled question in this Circuit whether emotional damages are sufficient, standing alone, to give rise to a First Amendment retaliation claim." *Hawthorne by Hawthorne v. County of Putnam*, 492 F. Supp. 3d 281, 302 (S.D.N.Y. 2020); *see Chavez v. Finney*, No. 19-CV-4109, 2022 WL 874716, at *5 n.6 (S.D.N.Y. Mar. 23, 2022). Some district judges in this Circuit have answered that question in the affirmative, holding that allegations as to "severe and extreme emotional distress . . . [are] sufficient to plausibly allege a claim of First Amendment retaliation." *Doe v. City of N.Y.*, No. 18-CV-670, 2018 WL 3824133, at *14 (E.D.N.Y. Aug. 9, 2018); *see Barkai v. Mendez*, 629 F. Supp. 3d 166, 201 (S.D.N.Y. 2022); *Barkai v. Nuendorf*, No. 21-CV-4060, 2023 WL 2691712, at *25-26 (S.D.N.Y. Mar. 29, 2023).

The Second Circuit, however, has made clear that in the "unusual context of intra-legislative retaliation," only "conduct that triggers official discipline or expulsion" gives rise to an actionable retaliation claim. *King v. City of N.Y.*, No. 22-231, 2023 WL 2398679, at *1 (2d Cir. Mar. 8, 2023). Such a rule is necessitated by the "unique rhetorical atmosphere of the political arena," which can "at times be rough and tough," *Munoz-Feliciano v. Monroe-Woodbury Cent. Sch. Dist.*, No. 13-CV-4340, 2015 WL 1379702, at *12 (S.D.N.Y. Mar. 25, 2015), and requires "[p]ublic officials . . . to have thicker skin than the ordinary citizen when it comes to attacks on their views," *Mattox v. City of Forest Park*, 183 F.3d 515, 522 (6th Cir. 1999); *see McGuinn*, 2015 WL 12731755, at *6 ("[T]he political arena is a unique setting where ordinary notions of First Amendment protection sometimes yield to the political nature of democratic governance. Numerous cases acknowledge a distinction between permissible

At bottom, "elected officials enjoy no First Amendment protection from retaliation for political speech unless that retaliation strips them of their office, or their fundamental ability to function in that office." *King*, 581 F. Supp. 3d at 570; *see Werkheiser v. Pocono Twp.*, 780 F.3d 172, 181 (3d Cir. 2015) (stressing that the First Amendment is not intended "to guard against every form of political backlash that might arise out of the everyday squabbles of hardball politics" and collecting cases). Mr. Stridiron's allegations do not rise to that level and thus do not implicate the First Amendment.

---

retaliation among politicians in pursuit of their political agendas and actionable retaliation in violation of the First Amendment.") (collecting cases).

"It simply cannot be that every [elected official] who subjects [him]self to the rough-and-tumble of electoral politics has an actionable First Amendment claim against [his] opponents who hold public office." *Munoz-Feliciano*, 2015 WL 1379702, at *12. Instead, because elected officials "enter[] an inherently adversarial and controversial environment," they "must accept the increased attention, criticism, scrutiny and even smears that come along with th[eir] decision [to serve in public office]." *Id.* Accordingly, "the First Amendment does not protect . . . political actors from retaliation by their foes for their position on matters of public concern." *King*, 581 F. Supp. 3d at 569.

Here, it is plain that the emotional injuries Plaintiffs allege as to Mr. Stridiron – even assuming they are sufficiently severe or extreme, which is not apparent – flow directly from his service as a public official. (*See* Ps' Opp. at 6 (Mr. Stridiron has "suffered from stress attributed to the district's action" and "been medically diagnosed with Depression directly related to events at the School District"); Ps' 56.1 Stmt. ¶ 4 (Mr. Stridiron "has been subjected to the stress when receiving the email . . . regarding the potential removal from the board . . . ."); *id.* ¶ 12 (Mr. Stridiron "has been recently diagnosed with Depression directly related to the events and circumstances involving the Defendants and this legal matter").) It is equally plain that Mr. Stridiron willingly entered the public arena, standing for election as a Board member across several terms, (*see* ECF No. 88-5 at 125:7-18 (Mr. Stridiron's deposition testimony that he was reelected as a Board member "[o]verwhelmingly" in spring 2022 and that he has served consecutive terms on the Board since 2014); ECF No. 96-65 (Ballotpedia entry for Mr. Stridiron submitted by Plaintiffs showing that Mr. Stridiron has filed for reelection as a Board member several times)), and that he still serves as a Board member, (*see* Ps' 56.1 Resp. ¶ 4).

Thus, while Mr. Stridiron's alleged emotional injuries may reflect an unusual level of discord and personal animus among the members of the Board, they are nevertheless the result of "politically motivated conduct . . . [that is] best left within the legislative sphere," *King*, 581 F. Supp. 3d at 569, and do not give rise to an actionable First Amendment retaliation claim.

Plaintiffs do not contend in their brief that Matthew being designated co-valedictorian rather than valedictorian is a harm Mr. Stridiron suffered as a result of his protected speech, but they seem to so allege in the Amended Complaint. (*See* ECF No. 15 ¶ 148.) Assuming they still so contend, summary judgment is nevertheless appropriate, because there is no evidence from which a reasonable jury could conclude that Matthew being named co-valedictorian was retribution for his father's speech. The individuals who made the ranking decision are not the people who Mr. Stridiron allegedly offended with his speech. There is no evidence of anyone on the Board influencing the administrators' decisions about class rank, nor is there evidence of anyone involved in that decision sharing the hostility toward Mr. Stridiron that some of his fellow Board members allegedly felt. Nor is there any evidence that the initial designation of Matthew as sole valedictorian was anything other than an innocent mistake. And while the temporal proximity between the April 2019 publication of the grand jury report implicating Mr. Stridiron's testimony, (*see* Ps' 56.1 Stmt. ¶ 28), and the late May 2019 ranking decision, (*see* Ps' 56.1 Resp. ¶ 79), might suffice to raise an inference of causation at the motion to dismiss stage, *see A.S. v. City Sch. Dist. of Albany*, 585 F. Supp. 3d 246, 273-74 (N.D.N.Y. 2022), it is not enough to survive a motion for summary judgment, *see McClendon v. Murphy*, No. 14-CV-1460, 2017 WL 1115200, at *5 (D. Conn. Mar. 24, 2017) ("A plaintiff alleging a First Amendment retaliation claim may not . . . rely on temporal proximity alone to defeat summary judgment."), and Plaintiffs provide no other evidence from which a reasonable jury could conclude that the class rank recalculation was caused by Mr. Stridiron's speech.

For these reasons, summary judgment on Mr. Stridiron's First Amendment retaliation claim is granted.

2.      **First Amendment – Matthew**

Plaintiffs contend that Defendants "deprived Matthew of the title of sole valedictorian in retaliation for his father's protected speech as a private citizen" and that "[d]iscovery has undeniably borne out evidence . . . that . . . Matthew Stridiron's protected speech w[as] . . . violated by the Defendants' actions," *i.e.*, the recalculation of Matthew's GPA and his designation as co-valedictorian.  (Ps' Opp. at 3-4.)

To the extent Matthew is claiming he suffered injury as retaliation for his father's speech, he lacks standing to do so.

> In the context of a First Amendment retaliation claim, this Court has held that a plaintiff may assert the constitutional claims of a third party if the plaintiff can demonstrate:  (1) injury to the plaintiff, (2) a close relationship between the plaintiff and the third party that would cause plaintiff to be an effective advocate for the third party's rights, and (3) some hindrance to the third party's ability to protect his or her own interests.

*Lewis v. City of N.Y.*, 591 F. App'x 21, 23 (2d Cir. 2015).  I will assume for the sake of argument that the first prong is met, and the second surely is.  But the third is not, as Mr. Stridiron plainly has the ability and incentive to assert his own rights.  *See id.* (where there were no allegations that mother could not protect her own rights, son lacked standing to assert claim he had been arrested or prosecuted as retaliation for mother's speech); *Dixon v. Lupis*, No. 20-CV-1754, 2021 WL 4391246, at *8 (D. Conn. Sept. 24, 2021) (dismissing third party claim where plaintiff did not allege his mother was incapable of vindicating her own rights).  I therefore assess whether Matthew has a claim on his own behalf.

A student alleging a First Amendment retaliation claim must show that "(1) he has an interest protected by the First Amendment, (2) the defendant's actions were motivated by or substantially caused by the plaintiff's exercise of that right, and (3) the defendant's action effectively chilled the exercise of the plaintiff's First Amendment right."  *Ford v. Reynolds*, 167

F. App'x 248, 250 (2d Cir. 2006); *see Sutton v. Stony Brook Univ.*, No. 21-2055, 2022 WL

4479509, at *4 (2d Cir. Sept. 27, 2022).  While private citizens claiming retaliation are typically

required to show that they suffered an "actual chill" in their speech, other forms of harm have

been accepted in place of the "actual chilling" requirement in limited contexts.  *Morales v.*

*Valley Stream Union Free Sch. Dist. 24*, 527 F. Supp. 3d 470, 474 (E.D.N.Y. 2021); *see Dorsett*

*v. County of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013) (collecting cases).

 Matthew's claim fails on the first prong.  Plaintiffs' brief does not explain what protected

speech of Matthew's they believe motivated the allegedly retaliatory decision to name him co-

valedictorian rather than valedictorian.  The only speech of Matthew's set forth in the Amended

Complaint is his interview at the SUNY Orange graduation, but that speech occurred after the

ranking decision, and thus could not have been the cause of it.  In the absence of protected

speech that could have motivated the retaliation, there is no claim.

 Even if Matthew could base his claim on his father's speech, he would fail on the second

prong – causation – for the same reasons that Mr. Stridiron could not establish that Matthew's

designation as co-valedictorian was caused by his protected expression.  (*See* Section III.A.1

above.)

 Matthew's claim also fails on the third prong, as he has not identified any evidence in the

record that his speech was actually chilled by Defendants' actions.  To the contrary, Plaintiffs

admit that even after being named co-valedictorian, Matthew continued communicating with

faculty and staff seeking adjustments to both his AP Computer Science and Walking for

Wellness grades.  (*See* Ps' 56.1 Stmt. ¶¶ 102, 105-106, 111, 113, 116-117.)  Matthew also

testified at his deposition that he gave an interview to a reporter at his SUNY Orange graduation,

(*see* Matthew's 50-h Depo. at 92:13-24, 94:3-8), which was included in an article published by

the Hudson Valley Press that Matthew promoted on his Twitter, (*see* ECF No. 100-1).  Plaintiffs

likewise do not dispute that Matthew gave a valedictorian speech during his NFA graduation,

(Ps' 56.1 Resp. ¶ 81), and note that Matthew wrote a "bestselling book . . . about his time in

Newburgh," after being named co-valedictorian, (*see* Ps' Opp. at 6; ECF No. 96-104 at 1-2 (a

copy of Matthew's book titled "Scheming in the Dark" which was published in 2022)).

In short, the record is replete with evidence that Matthew continued exercising his First

Amendment rights despite the actions Plaintiffs ascribe to Defendants.  *See Curley v. Village of*

*Suffern*, 268 F.3d 65, 73 (2d Cir. 2001) (holding that "[w]here a party can show no change in his

behavior, he has quite plainly shown no chilling of his First Amendment right to free speech"

and granting summary judgment because defendants' actions "had no effect on [plaintiff's]

exercise of First Amendment rights"); *Sloup v. Loeffler*, No. 05-CV-1766, 2008 WL 3978208, at

*22 (E.D.N.Y. Aug. 21, 2008) ( where "the record demonstrates that plaintiff vigorously

exercised his First Amendment rights subsequent to all of the allegedly retaliatory conduct

plaintiff has alleged," a plaintiff's "First Amendment claim fails as a matter of law and,

therefore, summary judgment . . . is warranted") (collecting cases).[10]

---

[10] Although it is not clear from their brief, insofar as Plaintiffs are alleging a First
Amendment retaliation claim based on the alleged interference with Matthew's interview at his
SUNY Orange graduation, they have similarly offered no evidence of chilling or harm.

Matthew testified that the interview was completed and that he was the only student to be
interviewed.  (*See* Matthew's 50-h Depo. at 92:13-94:8.)  He also promoted the resulting news
article on his Twitter account.  (*See* ECF No. 100-1.)  As Matthew "exercised [his] right to
speak, [he] has quite plainly shown no chilling of [his] First Amendment right to free speech."
*Balaber-Strauss v. Town/Village of Harrison*, 405 F. Supp. 2d 427, 434 (S.D.N.Y. 2005).

Similarly, the allegedly "threatening and menacing" conduct at the SUNY Orange
graduation that Plaintiffs ascribe to Sklarz does not constitute a sufficiently concrete harm to
sustain a First Amendment claim.  (Ps' Opp. at 7.)  Instead, such conduct is at most a petty slight
that does not give rise to a constitutional violation.  *See Moriates v. City of N.Y.*, No. 13-CV-
4845, 2016 WL 3566656, at *4 n.5 (S.D.N.Y. June 24, 2016) (stating in context of First

Accordingly, the only way Matthew can meet the third prong of the test is if his being named co-valedictorian, rather than sole valedictorian, "establish[es] a concrete harm sufficient for a federal claim of First Amendment retaliation." *Zherka v. Amicone*, 634 F.3d 642, 646 (2d Cir. 2011). As a preliminary matter, the record does not reflect that the designation was wrongful, and therefore it hardly qualifies as a harm. At the time the decision was made, and at the time of graduation, Matthew was the salutatorian, and Padilla decided to name him co-valedictorian anyway. (*See* Ps' 56.1 Resp. ¶¶ 64-75.) It was only well after the fact, when Matthew over the summer convinced NFA to raise his junior-year AP Computer Science grade and convinced SUNY Orange to raise his Walking for Wellness grade, that he had any argument that he was sole valedictorian. But I will assume for the sake of argument that a decision that was correct when made could qualify as a harm, and turn to whether it is sufficiently concrete.

The Court has not been able to identify any precedent addressing this issue in the context of the First Amendment,[11] and therefore looks to other non-chilling harms that courts in this

---

Amendment retaliation claim that "[y]elling amounts, at best, to . . . petty slights or minor annoyances."); *Troy v. City of N.Y.*, No. 13-CV-5082, 2014 WL 4804479, at *8 (S.D.N.Y. Sept. 25, 2014) (holding that threats to arrest plaintiff are insufficient to show concrete harm). And as to Fishkind, there is no evidence in the record that he had any agency or employment relationship with the District as would be required to establish liability, (*see* Ps' 56.1 Resp. ¶ 85), and in any event, the physical contact Plaintiffs ascribe to him, namely grabbing Matthew's arm, (*see* Matthew's 50-h Depo. at 95:12-24), is *de minimis* harm in the context of a First Amendment retaliation claim, *see, e.g.*, *Hixon v. Adult Prob. & Parole Dep't*, No. 09-CV-655, 2011 WL 294508, at *3 (W.D. Pa. Jan. 27, 2011) (holding that actions like bumping and knocking someone into a wall or elbowing someone at a meeting "do[] not rise to the level of a constitutional deprivation" in the First Amendment context).

[11] Most of the limited number of federal cases the Court has identified addressing valedictorian disputes appear to focus on due process, equal protection, and disability discrimination violations. *See, e.g.*, *Shepard v. Cleveland Sch. Dist.*, 822 F. App'x 312, 313 (5th Cir. 2020) (holding "there is no constitutional right to being named sole valedictorian" and determining that plaintiff did "not have a property interest in being named sole valedictorian" where her high school's "handbook explicitly contemplates the possibility of having multiple valedictorians"); *James v. Cleveland Sch. Dist.*, No. 19-CV-66, 2021 WL 3277239, at *15 (N.D.

circuit have held to be sufficient.  Such harms include the loss of a governmental contract, additional scrutiny at border crossings, revocation of building permits, and the refusal to enforce zoning laws.  *See Dorsett*, 732 F. 3d at 160 (collecting cases).

In contrast, the Second Circuit has held, albeit in the public employee context, that the deprivation of a status or an honor that carries little or no value is properly classified as *de minimis* harm that cannot support a First Amendment retaliation claim.  *See Zelnik v. Fashion Inst. of Tech*., 464 F.3d 217, 225 (2d Cir. 2006) (holding "that the failure to afford Professor Emeritus status to [plaintiff] was not an adverse action because the benefits of such status, given the record before us, carry little or no value" and "[t]he benefit of emeritus status . . . is merely honorific.").  Other courts have found that threats to arrest, *see Troy*, 2014 WL 4804479, at *8, conclusory allegations of injury to reputation and standing in the community, *see Maco v. Baldwin Union Free Sch. Dist.*, 249 F. Supp. 3d 674, 679-80 (E.D.N.Y. 2017), *aff'd*, 726 F. App'x 37 (2d Cir. 2018), and "a *de minimis* amount of vote dilution, even if intentionally

―――――――――――――

Miss. July 30, 2021) (denying due process claim where plaintiff was not named salutatorian because "[w]hile [plaintiff] takes issue with the method for calculating [grades], there is no dispute that, as calculated, her Grade Point Average was not the second highest in her class" and "therefore . . . there was no deprivation of this property interest") and denying equal protection claims because plaintiff failed to establish discriminatory purpose or intent), *aff'd*, 45 F.4th 860 (5th Cir. 2022); *Sylvester v. Tex. S. Univ.*, 957 F. Supp. 944, 945, 947 (S.D. Tex. 1997) (finding that plaintiff's due process rights were violated where defendant "consistently disregarded every aspect of fair procedure, including its own rules and court orders," thus denying plaintiff "a review of her final that complied with school rules about grade disputes" and ordering that defendant change plaintiff's grade and "her class rank from third to first, with [plaintiff] sharing that position with the current valedictorian."); *Horstine v. Township of Moorestown*, 263 F. Supp. 2d 887, 893, 906 (D.N.J. 2003) (issuing temporary restraining order naming plaintiff sole valedictorian where co-valedictorian designated by new valedictorian policy had lower GPA than plaintiff and the new policy was "intended and designed to have a particular exclusionary effect on plaintiff because of her disabled status," in violation of the ADA and Rehabilitation Act).

imposed," *Shapiro v. McManus*, 203 F. Supp. 3d 579, 596-97 (D. Md. 2016), do not suffice to show a cognizable injury.

Here, even assuming for the sake of argument that the title of sole valedictorian has inherent value, *see Augustine v. Avoyelles Parish Sch. Bd.*, No. 06-CV-1663, 2008 WL 1946779, at *3 (W.D. La. May 5, 2008) (referencing Tulane University scholarship exclusive to valedictorians); Rick Rojas, *Her High School Said She Ranked Third in Her Class. So She Went to Court*, N.Y. Times, (May 28, 2021) https://www.nytimes.com/2021/05/28/us/dalee-sullivan-gpa-alpine.html ("In Texas, the highest-ranking high school graduates can receive free tuition for their first year at in-state public institutions."),[12] there is no evidence that Matthew's designation as co-valedictorian deprived him of any benefit that he would have been afforded were he sole valedictorian. To the contrary, the record demonstrates that Matthew gave a full valedictorian speech at his NFA graduation ceremony, (*see* Ps' 56.1 Resp. ¶ 81), and that neither his college prospects, (*see id.* ¶ 94), nor his enrollment at Columbia, (*see id.* ¶¶ 125, 127), were impacted in any way. There is likewise no indication that that being named co-valedictorian had any impact on the scholarship that Matthew received. (*Cf.* ECF No. 96-100 at 85:10-19, 87:23-88:4, 88:19-89:15 (deposition testimony that Matthew's scholarship is considered "a full scholarship," is provided through the Bill Gates Foundation, and is contingent on Matthew maintaining "acceptable" academic performance at Columbia, *i.e.*, "a grade point average of a 3.0").)

Simply put, Plaintiffs have offered no evidence that Matthew suffered any concrete harm as a result of being named co-valedictorian, rather than sole valedictorian. *See Maco*, 249 F.

---

[12] *But see* Winnie Hu, *How Many Graduates Does It Take to Be No. 1?*, N.Y. Times, (June 26, 2010) https://www.nytimes.com/2010/06/27/education/27valedictorians.html (Harvard Dean of Admissions observed that being named valedictorian is "a bit of an anachronism" that "has been a long tradition, but in the world of college admissions, it makes no real difference").

Supp. 3d at 679-80.  The Court does not doubt that Matthew was eager to be named sole

valedictorian and that his redesignation as co-valedictorian was a disappointment.  (*See*

Matthew's 50-h Depo. at 74:22-25 (describing being named co-valedictorian as "negative" and

"being bumped down"); *id* at 91:2-19 (stating that "[t]he fact that I can't stay I'm sole

valedictorian . . . that hurts")).)  But "[h]urt feelings or a bruised ego are not by themselves the

stuff of constitutional tort."  *Zherka*, 634 F.3d at 645-46.[13]

---

[13] Plaintiffs also maintain that Matthew suffered "stress" as a result of Defendants' actions.  (Ps' Opp. at 6.)

As I explained previously, the Circuit has not decided whether emotional damages, standing alone, may be sufficient to give rise to a First Amendment retaliation claim, and certain district court judges have answered that question in the affirmative in the context of motions to dismiss.  (*See* Section III.A.1 above.)  Others have found such harm insufficiently concrete.  *See, e.g.*, *Hawthorne*, 492 F. Supp. 3d at 302.

But the bar is higher at the summary judgment stage, and a plaintiff must produce evidence showing that they have suffered concrete harm as a result of Defendants' actions.  *See Maco*, 249 F. Supp. 3d at 679-80.  But the "stress" evidence Matthew has adduced here does not reach that level.  Instead, Matthew testified at his deposition that he saw a psychologist weekly for three months starting in June 2019 at the suggestion of his lawyers, (ECF No. 96-100 at 99:8-100:11); that he never received any formal diagnosis in connection with the stress he alleges, (*see id.* at 102:12-103:15); that his therapist never referred him to any specialists for a formal psychiatric evaluation, (*see id.* at 103:16-105:10); and that he never sought any mental health treatment after moving to New York City to attend Columbia, (*see id.* at 107:16-21).  Matthew also testified that he himself did not think that his "emotional state was damaged," that he was instead "concerned about [his] family," (*id.* at 108:3-6), and that he attributes the stress to "the fact that [he has] spent lots of time researching [his] case," not to being named co-valedictorian, (*id.* at 115:16-24; *see id.* at 128:13-129:4 (Matthew's testimony that "lately, whenever I've thought about this case, the muscles . . . start getting tense and it's only when I start thinking about this case"); *see* Ps' 56.1 Stmt. ¶ 191 ("Matthew testifies he was stressed out because he spent 75%-90% of his time outside of college focused on this lawsuit and threats made against his family."); *id.* ¶¶ 197-198 (referencing Matthew's "case-related stress")).  A rational jury would have to conclude that, as Matthew testified, his stress is not from Defendants' action in naming him co-valedictorian but rather from his decision to spend so much time of his time on this lawsuit.

In any event, as Judge Ross explained in *Doe*, a court's inquiry into a First Amendment retaliation claim "is not static across contexts, but rather must be tailored to the different circumstances in which retaliation claims arise."  2018 WL 3824133, at *15.  Applying that standard in *Doe*, Judge Ross stressed that plaintiff was "aggressively questioned and intimidated

Accordingly, both Mr. Stridiron's and Matthew's First Amendment retaliation claims fail as a matter of law and must be dismissed.[14]

## B.   State Law Assault Claim

Typically, the Court would decline to exercise supplemental jurisdiction over Plaintiffs' remaining state law claim because I have granted summary judgment on their federal claims. *See Kolari v. N.Y.-Presbyterian Hosp.*, 455 F.3d 118, 122 (2d Cir. 2006) ("traditional values of judicial economy, convenience, fairness, and comity" weigh in favor of declining to exercise

---

by a man with a badge and a gun mere hours after two detectives allegedly raped her in the back of a police van," *id.*, circumstances that "at least at the pleading stage" gave rise to sufficiently concrete "severe and extreme emotional distress," *id.* at *14.

In contrast, the evidence here reflects no such extreme circumstances and, accordingly, fails to elevate "[h]urt feelings" stemming from not being named sole valedictorian into an actionable First Amendment retaliation claim. *Madden v. Town of Hempstead*, No. 16-CV-6835, 2019 WL 1439935, at *16 (E.D.N.Y. Mar. 29, 2019) (granting summary judgment to defendants because "plaintiff's conclusory allegations of emotional and psychological harm, anxiety, intimidation and harassment are insufficient to withstand summary judgment"); *cf. Zelnik*, 464 F.3d at 228-29 (holding that "an individual of ordinary firmness would [not] be deterred or dissuaded from exercising his free speech rights if threatened with the withholding of [a] purely honorific title"). *Doe* relied on cases finding "embarrassment, humiliation, and emotional distress" to be sufficient concrete harm, 2018 WL 3824133, at *13, but there is nothing embarrassing or humiliating about being co-valedictorian.

I do not hold that emotional distress can never constitute the concrete harm necessary for a First Amendment retaliation claim, but in my view if it were to suffice, it would have to be in extreme circumstances like *Doe*. The garden-variety stress claimed here (even if it were proximately caused by Defendants' actions) should not suffice. Even a threat of arrest has been found insufficient to constitute concrete harm, *see Troy*, 2014 WL 4804479, at *8, and that strikes the Court as more distressing than being named co-valedictorian rather than sole valedictorian. Any plaintiff is almost invariably going to suffer some emotional distress, so allowing it to routinely suffice for concrete harm would essentially swallow the requirement. The existence (or not) of a constitutional violation should not turn on the sensitivity of the particular plaintiff.

[14] Throughout this litigation I have tried to assure Plaintiffs that they should both be proud of Matthew's achievements; that nobody thinks less of Matthew because he is co-valedictorian rather than sole valedictorian; and that the distinction will have no effect on his future success. "It would trivialize the First Amendment," *Zelnik*, 464 F.3d at 226, if that slight a distinction gave rise to a constitutional violation.

supplemental jurisdiction where all federal-law claims are eliminated before trial).  But a Court may exercise its discretion to retain supplemental jurisdiction over a state law claim where "the parties have already completed discovery," and where "the state law claim will not require resolution of any difficult questions of state law."  *Finkelstein v. Mardkha*, 495 F. Supp. 2d 329, 345 (S.D.N.Y. 2007); *see Diaz v. Vargan*, No. 16-CV-9106, 2018 WL 4360790, at *13 (S.D.N.Y. Aug. 29, 2018) (exercising supplemental jurisdiction where the parties had completed discovery, the state law claims "involve settled, routine principles of law," and "[d]ismissing the claims would require the parties to duplicate . . . their work before another court and would squander the Court's work on the case, as well as put the matter at the back of a very long queue of cases awaiting trial in the New York State Supreme Court."); *Motta v. First Unum Life Ins. Co.*, No. 09-CV-3674, 2011 WL 765838, at *1 (E.D.N.Y. Feb. 24, 2011) ("When discovery is complete, a case is ready for trial, and the state law claims involve only settled principles not novel legal questions, it is proper for a district court to retain jurisdiction.").

Plaintiffs' only state law claim is an assault claim asserted on Matthew's behalf, in relation to the interview that occurred during his SUNY Orange graduation.  (*See* ECF No. 15 ¶¶ 179-184.)  Discovery is complete "and both the parties and the Court have expended significant resources, time, and energy on this case."  *Diaz*, 2018 WL 4360790, at *13.  The New York law governing assault is well settled.  Accordingly, I exercise my discretion to retain jurisdiction over Matthew's state-law assault claim.

"Under New York law, civil assault is an intentional placing of another person in fear of imminent harmful or offensive contact."  *Tardif v. City of N.Y.*, 991 F.3d 394, 410 (2d Cir. 2021).  The plaintiff "must show that another person made an intentional attempt, displayed by violence or threatening gesture, to do injury to, or commit a battery upon him."  *Kravtsov v. Town of*

*Greenburgh*, No. 10-CV-3142, 2012 WL 2719663, at *16 (S.D.N.Y. July 9, 2012).  "[H]arsh words or verbal threats, standing alone, do not constitute assault."  *Bouveng v. NYG Cap. LLC*, No. 14-CV-5474, 2015 WL 3503947, at *10 (S.D.N.Y. June 2, 2015); *see Veras v. United States*, No. 16-CV-8045, 2018 WL 3711788, at *5 (S.D.N.Y. Aug. 3, 2018) ("In order to sustain a cause of action to recover damages for assault, there must be proof of physical conduct placing the plaintiff in imminent apprehension of harmful contact."); *Castro v. Local 119*, 964 F. Supp. 719, 732 (S.D.N.Y. 1997) ("With respect to verbal threats, words not accompanied by circumstances inducing a reasonable apprehension of bodily harm, such as movements of drawing back a fist, aiming a blow, or the show of a weapon, do not constitute an assault.").

Plaintiffs' brief alleges that two unnamed District employees "both acted in a threatening and menacing manner and one actually made physical contact with [Matthew]," that one of the employees "created a verbal argument with the reporter and prevented the free flow of words between Matthew . . . and the reporter," and that "[t]he district employee was not standing there for any other reason than to prevent free speech and to intimidate both Matthew . . . and the reporter."  (Ps' Opp. at 7.)

Based on the record, the two employees in question appear to be Cassie Sklarz, a non-party District employee, (*see* Matthew's 50-h Depo. at 92:13-95:7), and Ari Fishkind, an employee of IBM, (*see id.*; Ps' 56.1 Resp. ¶ 85).  As to Sklarz, the available evidence at most demonstrates that she stood close to Matthew and the reporter during the graduation and "verbally berat[ed]" the reporter.  (Matthew's 50-h Depo. at 92:13-93:15.)  But there is no indication that Matthew felt threatened by Sklarz or that she made any physical movements that would have induced in him a reasonable apprehension of bodily harm, and Matthew himself testified that he "continue[d] with the interview" and "was the only student that [the reporter]

was allowed to interview . . . ."  (Matthew's 50-h Depo. at 94:3-8.)  In other words, "no evidence exists of any physical conduct by [Sklarz] that placed the plaintiff in imminent apprehension of harmful contact at any time, as required to establish civil assault."  *Veras*, 2018 WL 3711788, at *6.  There is thus no tort for which the District could be liable under a theory of *respondeat superior* for acts of its employee.  *See, e.g.*, *Lederman v. Benepe*, No. 12-CV-6028, 2016 WL 11588628, at *5 (S.D.N.Y. Mar. 11, 2016) (no basis under New York law for *respondeat superior* claim against employer when claim against employee fails).

As to Fishkind, Plaintiffs baldly claim that the District should be held liable for his making physical contact with Matthew, (*see* Ps' Opp. at 7; Matthew's 50-h Depo. at 93:16-94:5, 95:12-24), because he was "employed by the District through the P-tech grant," (*see* Ps' Opp. at 7).  But Plaintiffs also admit that Fishkind "is an employee of IBM," (*see* Ps' 56.1 Resp. ¶ 85), and have identified no evidence demonstrating that Fishkind had any sort of employment or agency relationship with the District.  Absent facts from which a factfinder could find a legally cognizable relationship between the District and Fishkind, the District cannot be held liable in tort for his actions.  *See In re Roman Cath. Diocese*, 651 B.R. 399, 414 (Bankr. S.D.N.Y. 2023) (explaining that "employment and agency" are the "two types of legal relationships" that "allow[] a plaintiff to hold a defendant liable in tort for the actions of a third party").

Accordingly, Plaintiffs' assault claim fails as a matter of law and must be dismissed.

**IV.**     <u>**CONCLUSION**</u>

For the foregoing reasons, Defendants' Motion for Summary Judgment is GRANTED.

The Clerk of the Court is respectfully directed to terminate the pending motion, (ECF No. 84),

enter judgment for Defendants, and close the case.

**SO ORDERED.**

Dated:  August 29, 2023
              White Plains, New York

_____
CATHY SEIBEL, U.S.D.J.